First case on this afternoon's docket is the case of the people of the state of Illinois v. Kennedy v. Crosby. And we have James Gomerick for the opponent and Rebecca McCormick for the advocate. Can you proceed? Presiding Justice Chapman, Justice Dunlap, Justice Welch, Tom, may it please the Court. I've inherited a propensity for an oversized stomach from my father. I also inherited the representation of Timothy Crosby from my father. As this Court is now well aware and as the appellant will readily concede, Timothy Crosby has a significant criminal history dating back decades that has resulted in an array of convictions. I first represented Timothy Crosby in 2002. I will tell this Court that Timothy Crosby is a homosexual. Timothy Crosby has a significant criminal history and more pertinently for our situation today, Timothy Crosby is and was an individual who by way of the events beginning on 12 March 2008 and concluding on 17 December 2009, was an individual who suffered a deprivation of his due process rights at the hand of the sovereign state of Illinois. We believe the record right readily so indicates and we hope that this Court will herewith favor our appeal from Judge Wharton's decision in this regard. I started to talk about Mr. Crosby and when I first represented him. I think it's important for me at this juncture to take a second to review the code provision that we're dealing with, and that is 725 ILCS 205 1.01 headset. But the definitions are important for what we do and what it says is all persons suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition. And again, the petition in this case was filed March 19, 2008, the same date as the filing of the criminal information here and after provided for, coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities towards acts of sexual assault or acts of sexually molestation of children, or are hereby declared sexually dangerous persons. Now that code provision is the sexually dangerous persons statute in the provisions that follow therefrom. We assert two points of error in this appeal. The first point containing two subparts. In other words, there are three areas of analysis that we're hoping that this Court will undertake in finding in our favor. I bring up 2002 and I bring up the dates March 12. March 12 is the date that this supposed child abduction happened, resulting in the filing of both the criminal information and a petition one week later. What happened was, we need to look back to November of 2007, I respectfully submit, in this case. And the reason I think we need to look back roughly 120 days before the filing of the criminal charge is that Crosby, having the frankly nasty criminal history that he had, was released, I say again released, from the Illinois Department of Corrections without there being any further interference with his liberty interest by way of the statute that we're all familiar with, that's right next to this code provision, which is what the sexually violent person statute. In other words, I say to you that that act or non-act, omission, undertaken by the State of Illinois, constituted, and for lack of a better term, an admission by non-action. They could have kept him and they chose not to. Why is that important for our analysis? We assert that when you examine the record that pertains to this particular proceeding, the only event, the only change in circumstance between the date of the determination by the court and his date of release from IDOC was what supposedly happened on 12 March 2008. And I don't know what this court will or won't do with that, but it is our respectful submission that with a full understanding of Redlich, Hancock, all of the litany of cases that say that you're not here for your jury trial on the criminal case, in this unusual instance, the state, in order to comport itself with traditional notions of due process, was duty-bound under the law to present at least some scintilla of evidence suggesting that there was legitimacy as to the claims rendered relative to March 12, 2008. And I say that based on what I would refer to as temporal proximity from release. When I say temporal proximity from release, again, it was only 120 days since he'd been cut free from IDOC. I don't seek to have the act in its entirety struck down. Our appeal is not, I say again, not an effort to attack based on insufficiency of evidence. It is rooted in due process. The statute that I read a minute or two ago does very clearly state immediately prior to the filing of the petition, here and after, provided for. And I mean, it seems to me that the statute contemplates that there be some temporal review. In other words, there's got to be something going on within the 360 days or thereabouts. Well, I don't know what you want to define as immediately, but they have to show that there was something going on immediately prior to the filing of the petition in a mental disorder that existed for not less than one year. Well, under these peculiar facts, because they cut him loose, it's our submission that they were legally obligated to show the court something about what happened on March 12. Again, so that this court is aware, and I believe it is well aware, there's only two witnesses that testified in this case. The two opining physicians testifying both as experts, and experts they were, albeit we take issue with a number of things about their opinions, and we'll move on to that shortly. The only other thing that I would say about our first issue and subpart one of our first issue is that we respectfully submit to this honorable court that there is a problem herein because the two sole testifying witnesses, the two opining experts, in part, and albeit there is testimony from Dr. Killian after an initial back and forth on Cross about how much he utilized the March 12, 2008 incident. Killian minimizes the amount of employment of the March 08 incident. Raven, to my best recollection, indicates to Judge Wharton during his testimony that he utilized a three-prong analysis and that one of the three prongs was the new incident. We take issue with that respectfully, and we have argued that in our brief, and the reason is that it's our submission that as if there being some provision of proof by way of competent evidence that that's to a deprivation or a form of deprivation of due process. Now, I do note that the state has cited a number of cases about expert testimony, and the language contained in those cases discusses quote-unquote facts reasonably relied upon by experts. One of the cases was the Nieves case. To my best recollection, Nieves involves a pathologist reviewing a previous pathologist's report. We respectfully submit that that's a far, far cry from opining physicians reviewing unattested to allegations contained within police reports. Having covered subpart one of our first argument, I think it's important for me to spend, well, as much time as you want me to and probably more talking about subpart two of our first argument, which is that, and I plead to the court that this court undertake, and I know the court will, a considered review of the testimony on cross-examination of these two opining physicians. The testimony on direct examination was relatively brief, quite frankly. But what we have here are two opining physicians who looked at the same material, and one fellow says there's little or no evidence that the respondent has interest in prepubescent males, boys. The other doc, Doc Rabin, says he's a pedophile because he's interested in boys. Now, if that isn't a signal right out of the box that there's a potential problem here, then I don't know what is. It is empirically so, and again, I'm not seeking to ask this court to throw out all of the actuarial information that have become used in these matters. It appears to me that the state misses my point when I talk about the usage of actuarial measures. Frankly, I think we need some type of standardized barometer in these cases because, I mean, that is how one attains, I think, the best effort at due process on this front is some type of standardization. But what we can't have and what this court must not countenance is actuarial tests utilized, in this case by Dr. Killian, where two of the three tests… First of all, Dr. Killian clearly stated that he had no specific training in any of the three tests that he used, and the tests are just questions that you go through and you say, is he this? If so, you attach a numerical designation apparently. But what we came to find out in our case, Killian testified November 12, 2009. Dr. Raven comes in 12-17, 2009, some one month later, and tells us all, well, two of the three tests, the Minnesota test and the Razor test, if I'm just going to call it that because I struggle with all of the R's that are involved in it, he says, those aren't even to be used in a sexually dangerous person context. Now, when you have two aligning physicians, the second of which comes in in a cross, says, well, the first guy who told you about how he's 80 to 85 percent actuarial in his approach and how 66.67 percent of the tests that he's using aren't even correctly utilized in this context, well, you've got a problem with physician number one at that point in time, I respectfully submit. You folks may feel otherwise. I don't know. But the tests, whatever tests were used by an untrained personnel, were not applicable for an SDP. By the way, on page six of my brief, there is a mistake. It should say SBPA as opposed to SDPA. I checked that as I was reading over the last minute or whatever it's worth. In other words, had the state seen fit to keep Crosby in November of 2007, then maybe, just maybe, Dr. Killian's utilization, well, we'd still argue that it's not because he doesn't have any training in it, but maybe, just maybe, they might be applicable because it's a sexually violent person consideration there, which is a different co-provision and a different liberty interest because the fella or gal isn't free of it. I don't want to say fella, but I don't think there's many gals who are subject to these. I've talked, I think, long enough about actuarial tests. We touched on the fact that Killian flat out says he can't diagnose Crosby with pedophilia when in fact, because there's little evidence, and that's in the record, little evidence of his involvement with young boys, boys, pre-pubescence. When Dr. Raven, again, was doing the same material, says he's a pedophile, I've kind of, in a way, buried the lead here because from my review of this co-provision, the quintessence of this co-provision is volitional capacity. In other words, we, as a society, have to accept that there are, contained within our number, individuals who fall, to a certain extent, beyond whatever is defined as norm. On the bell curve, what we have apparently allowed is, on a proactive basis, the sovereign state to rehabilitate certain other individuals who harbor not only a departure from the norm, but who also lack volitional control. And the Masterson case, and several cases that have come thereafter, confirm that without there being a determination, in fact, the state at the conclusion of our record here, Mr. Sallison, made a specific request that the court must find lack of volitional control. There's language in the state's brief citing the farmer that, well, we'll get to that later, but volitional control. And we developed testimony on cross-examination from these two doctors. Again, there's a medical definition and it's a legal definition, and they describe it as a medical-legal definition of sexually dangerous. But the predicate upon which the definition of being sexually dangerous is based, and without it you have, I respectfully submit, a morass, you do not have due process, is that there be some common understanding amongst the opining experts as to what they're talking about when they talk about volitional capacity. And when queried by me, Dr. Killian unequivocally stated, and my brief and what I say to you now does not misrepresent anything about what happened there. I was there. We inquire on pages 32, 33, and 34 of the… Your time is up. You'll have the opportunity to vote. Thank you. Your Honor's counsel, the defendant seems to attach a great deal of nefarious intent on the state for not bringing a sexually violent person's petition prior to the defendant's release. That's a fact of no consequence. The fact is that the defendant committed a crime and was charged with a crime of child abduction. If he had not done so, there would have been no sexually dangerous person's petition because that is the basis. A sexually dangerous person's petition must be brought in an underlying criminal prosecution. We don't know if he committed a crime. You didn't mean to say committed a crime. I was saying that he was charged with a crime. But there has to be a reasonable basis for charging a probable cause. Yes. But if that is dismissed, that charge, are never prosecuted, no lacrosse? It is not prosecuted. There is an election between the petition proceeding on a sexually dangerous person's petition or proceeding on the child abduction charge. What if they make a charge and then it's determined at some later point that maybe the wrong person was charged? Would that invalidate the petition for the sexually dangerous person? Well, I don't see that they... Well, whatever became of the child abduction charge, they proceeded under the... Right, it's an election and it will not be prosecuted. It will not be prosecuted. No, no, no. According to the way the statute is set up, the underlying charge does not even have to be a sexually related charge. It could be a theft or a burglary or an armed robbery or something. But then, once an election is made to proceed with a sexually dangerous person's petition, then the underlying charge, the criminal charge, does not have to be proved and it is not pursued. What do they do procedurally? You know, that's a very good question. I would assume that it would have to be null-prossed or dismissed upon the successful prosecution of a sexually dangerous person's petition. But none of those things happened in this case. It proceeded on the sexually dangerous person's petition alone. And the state was not required to prove the underlying charge of child abduction. Child abduction itself doesn't necessarily involve an underlying crime of a sexual nature. It is luring a child for an unlawful purpose. And in this case, the defendant doesn't argue that his unlawful purpose was to commit a sexual assault on the child. So it wasn't necessary. All that the petition did was recite that it was being brought in a criminal proceeding as is required by the law. But as far as proving child abduction, in this case it wasn't necessary. Of two of the elements that the state has to prove is propensity and demonstrated propensity. And the state did that and was not necessary to even bring up the child abduction. The state did that through proving his five prior criminal prosecutions and convictions. For 1986, a criminal sexual abuse. 1991, solicitation of a prostitute. 1988, two counts of aggravated sexual abuse with a minor. 2002, three counts of possession of child pornography. 2002, criminal sexual abuse involving a mentally challenged person who was 20 but had the age of a child. So that is what the state had the burden to prove, not this underlying offense. Now, the defendant complains about Dr. Killian and Dr. Raven examining evidence that pertained to the child abduction. But that's a different matter. It's not that the state had no burden to prove that. But an expert has the right within their expertise to choose what materials they consider relevant to making their determination. In this case, they had to make a determination of whether the defendant had a mental illness that persisted more than a year prior to the filing of the petition. And they had to draw a conclusion about whether there was a substantial probability that he would likely re-offend if not incarcerated or hospitalized. Now, and it's settled that an expert may give their opinion and base their opinion on facts, not on evidence. And the state, in our briefly cite, in rape detention of Isabel and also in rape detention of Lieberman, both of those cases involved petitions in which the experts were properly permitted to testify about facts, not evidence, that were the basis for their opinion. And those involved police reports of uncharged criminal sexual crimes. So, in this case, both Dr. Killian and Dr. Raven examined fully, and they detailed, and I won't go into all the materials they examined, but they did examine the police reports pertaining to this child abduction. And also, Dr. Raven explains that he viewed the interview of the child victim's father and the defendant himself, as well as interviewing the defendant in person. All of these things are relevant, they testified, to determining what it was they were required to render an opinion on. The mental illness, the mental disorder of the defendant and the likelihood of whether he will re-offend if not confined. So, I mean, that is a settled non-issue. It's also settled that the use of actuarial instruments is proper, and that's been decided by the Illinois Supreme Court. So that is also not an issue. Now, it's true there was a disagreement among the experts about what particular actuarial instruments were appropriate to use in a sexually dangerous person's petition. But they both agreed that the third one that Dr. Killian used was the static 99, and that was proper. So there's agreement as to one of the three actuarial instruments that Dr. Killian used. So that was sufficient evidence there. But as far as the other two, Dr. Raven would not have used the Minnesota test or the Razor test in a sexually dangerous person's petition. He thought those were only appropriate for sexually violent persons. But they both agreed that the defendant had a mental illness, a mental disorder that had persisted more than a year prior. And there's no disagreement as to whether he had this mental disorder. It's just that one testified that the defendant had a paraphilia not otherwise specified. The other one found that because the first expert did not think that there was sufficient evidence to make a decision that he was actually a pedophile, which is a subset of paraphilia. Well, of paraphilia. The other expert, Raven, thought that there was enough evidence to say that the defendant suffered from paraphilia and specifically pedophilia, which is a subset, a sub-diagnosis, a more particularized diagnosis of paraphilia. Pedophilia is a paraphilia. And so in that sense, one just was a little more focused in his diagnosis of a mental disorder than the other. One was just, but they both agreed that he had this paraphilia and that he had a mental disorder. So, you know, it was easy for the trier of fact to reconcile those two opinions. Dr. Raven also viewed videotapes of the defendant having sex with minors. So the court, the trier of fact could have placed more emphasis on that and could have found that yes, there was enough evidence to say that the defendant was a pedophile. In any event, there's no major disagreement that the defendant has a paraphilia and this has persisted. They also didn't have any disagreement over whether he had criminal propensity and a substantial probability to re-offend if not treated. And Dr. Raven, his testimony on this issue is not attacked by the defendant. So that was sufficient. But even if you just take, if the court just credited one test, one actuarial test that Dr. Killian used, that Dr. Raven said was appropriate for a sexually dangerous person's petition, that was the static nine, then the court could have accepted part of Dr. Killian's testimony about the probability, the substantial probability. So there is no problem there, even though there's some, you know, one would have made a more pointed diagnosis. One wouldn't have used two of the tests that, but testified that the static 99 was appropriate. They both agreed in the end that there was a substantial probability that the defendant would re-offend. The defendant doesn't complain about the other elements, the demonstrated propensities and the propensities to the commission of sex offenses. Those approved by certified criminal convictions of sex crimes. Now as far as the defendant's complaint about volitional capacity, Dr. Killian said that there's no unified definition that uses the same terms, but that's a little different than saying that there's no understanding of what volitional capacity is within the mental health field. And also, it was the court that had to make this legal decision about volitional capacity, and the court very well understood what volitional capacity meant. It's defined, mental disorder means a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence. And in Varner, the court construed these terms. This Varner is an Illinois Supreme Court case cited in People's Brief. It says the terms emotional and volitional are merely adjectives that describe why a person might lack the capacity to control behavior. But the court went on to say that it is a person's repeated, well not repeated, but acting on propensities that demonstrates a lack of volitional capacity. So, in this case, there's no confusion about that. The court had no confusion about that. And the defendant has certainly demonstrated his lack of volitional capacity by his long criminal history. And unless there are any questions. Thank you. Thank you, Ms. Concord. Mr. Garnett. When I get back to volitional capacity, since that's where I left off when I was talking longer than I should have. Volitional capacity. Volitional capacity without an understanding, a common scientific understanding of volitional capacity, then it's a short path to perdition indeed when it comes to this statute. Because you have doctors who are formulating opinions, and if they don't have some type of a concept of what they're defining, then the process is offended. Killian, 11-1209. Not a clear definition for volitional capacity or excellent ways of assessing volitional capacity. I think that's pretty fair, that there's not a clear definition for volitional capacity or excellent ways. The question that followed thereafter you'll find in your review of the record is, and this is where it becomes important on a scientific basis. Therefore, on baseline premise, when you don't have a common understanding of terminology between members of the scientific community, you have a circumstance that is fraught with difficulty in terms of reliability and validity, don't you? And he answers to some extent, yes. A similar line of inquiry was put to Dr. Rabin. Dr. Rabin's answers are contained within the record. We have cited thereto, and it is our submission that we misrepresented nothing as to their testimony. To give you some idea of the problems that we have herein, I point out to the court the language contained in full paragraph one of the state's brief, wherein the state says, and I quote, that definitions of volitional capacity may use different words to describe volitional capacity does not mean that the definitions do not agree in ultimately describing the term or that there's lack of consensus about the meaning of the term. Well, I take issue with that. I'm not going to criticize the sentence structure or anything along those lines, but when you start employing varying terms in the definition, then again, you're going to have problems. The language cited to by the state at the bottom of that same page and flowing into the next page referencing Varner, I urge the court to examine the text of the Varner decision because that language is utilized in the past tense in that decision when describing their actions in a prior Varner decision that accrued previous to the United States Supreme Court's action  In other words, I think it's problematical for that to be considered as authoritative of anything when it comes to volitional capacity. There's reference to consensus about one of the three tests being proper on an actuarial basis, that being the static 99. Well, one out of three might keep you in the big leagues, and it may get you in the Hall of Fame, but it's the respectful submission of the appellant that Batten 333 in this context is not good enough for the purposes of due process. There's a suggestion to the effect that the court credited parts of testimony, didn't credit parts of other testimony in making its findings, and I am in my rebuttal, and given that the state talked about the court's findings, it is my hope that the court examine what the findings were that were made by Judge Wharton with all due deference to him. There isn't a singleton reference to Judge Wharton at the time he made his adjudication on 17 December 2009 about crediting one doctor and not crediting the other doctor or picking out parts of one doctor's testimony. I'm not going to go into, although I'm inclined to, what I cite as my second point on appeal. You'll have to. It is what it is. Because the court did take into account the reports of the doctors, even after he said he wouldn't. But there is no such indication that one physician was credited, another physician wasn't, which is accepted by the law. Thank you. I appreciate your time.